UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| LOGAN DYJAK, )<br>      Plaintiff, )<br> )<br>v. )<br> )<br>STACEY HORSTMAN, et. al., )<br> )<br>      Defendants. ) | No.: 21-3151-JES |

## ORDER AND OPINION

Plaintiff, Logan Dyjak, is a civil detainee in the custody of the Illinois Department of Human Services ("IDHS") after having been adjudicated not guilty by reason of insanity ("NGRI"), on a murder charge.[1] Plaintiff is currently civilly committed to the McFarland Mental Health Center ("McFarland") in Springfield, Illinois, and has filed suit pursuant to 42 U.S.C. § 1983. As a result of his NGRI status, Plaintiff is considered a civil detainee or aquitee, rather than a prisoner. *See Dyjak v. Harper*, No. 22-1419, 2023 WL 5928160, at *3 (7th Cir. 2023). *See also Banks v. Thomas*, No. 11-301, 2011 WL 1750065, at *2 (finding that persons adjudicated NGRI are not prisoners under § 1915) (collecting cases). Defendants have filed a Motion for Summary Judgment (Doc. 42) and an accompanying Memorandum (Doc. 43). Despite being granted a series of extensions, Plaintiff has failed to respond. For the reasons indicated herein, Defendants' Motion for Summary Judgment (Doc. 42) is GRANTED.

---

[1] On November 20, 2012, Plaintiff was adjudicated NGRI for the murder of his grandmother. (Doc. 43-3 at 2).

1

## BACKGROUND

Plaintiff's complaint asserts that McFarland psychiatrist, Stacey Horstman, M.D., McFarland Clinical Director, Jo-An Lynn, and McFarland Administrator Lana Miller,[2] violated his Fourteenth Amendment rights. Plaintiff specifically pled that Defendant Horstman did not exercise sound medical judgment when she changed his diagnosis from "in remission" to "in partial remission." He claims that she did so, based at least in part, on a report Defendant Lynn had sent her which allegedly concerned another patient. Plaintiff alleges that he suffered "bodily movement" restrictions due to the revised diagnosis.

Plaintiff also pled that Defendants Lynn and Miller violated his due process rights when they did not formulate an individualized treatment plan which would have given him broader movement - access to non-restricted settings. The Court notes that there is significant, and sometimes confusing, overlap between the deliberate indifference and due process claims. In one, the lack of access is characterized as the injury that flowed from Defendants' alleged medical deliberate indifference. In the other, the lack of access, itself, is characterized as the constitutionally violative conduct, as the failure to provide non-secure settings privileges allegedly violated a due process liberty interest.

Lastly, Plaintiff asserts that Defendants Lynn and Miller are liable to him for not addressing his grievance complaining of Horstman and Lynn's alleged deliberate indifference.

As noted, Plaintiff has failed to respond to Defendants' motion for summary judgment. When the non-movant does not respond to the movant's statement of facts, the non-movant concedes the movant's version of the facts. *See Salatas v. Lake Cnty. Gov't*, No. 20-414, 2023 WL 4947916, at *2 (N.D. Ind. Aug. 2, 2023) (noting that where plaintiff has not responded and

---

[2] *See* Complaint (Doc. 1 at 2).

2

challenged defendant's Statement of Material Facts, "the facts . . . as asserted by Defendant and to the extent they are consistent with the evidence cited in support, are considered to exist without controversy for the purposes of this Motion for Summary Judgment.") (citing *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994). However, a party's failure to submit a timely response to a motion for summary judgment does not automatically result in summary judgment for the moving party. *See United States v. Goldberg*, No. 15-5746, 2018 WL 1531002, at *3 (N.D. Ill. Mar. 9, 2018) ("an opposing party's silence—in failing to respond to the movant's statement of material facts—must "be weighed in light of other evidence rather than leading directly and without more to the conclusion of guilt or liability.'") (quoting *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391 (7th Cir. 1995)) (emphasis omitted). If there remains a genuine disputed issue, "'summary judgment must be denied even if no opposing evidentiary matter is presented.'" *LaSalle*, 54 F. 3d at 392 quoting *Wienco Inc. v. Katahn Assocs., Inc.*, 965 F.2d 565, 568 (7th Cir. 1992) (in turn quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160 (1970)).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). When presented with a motion for summary judgment, the Court must construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Although a court must "construe all inferences in [a] non-movant's favor, [] he is not entitled to the benefit of inferences that are supported only by speculation or conjecture." *Boss v. Castro*, 816 F.3d 910,

916 (7th Cir. 2016) (citing *Nichols v. Mich. City Plant Planning Dept.*, 755 F.3d 594, 599 (7th Cir. 2014)).

The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323-24. Once a properly supported motion for summary judgment is filed, the burden shifts to the non-moving party to demonstrate with specific evidence that a triable issue of fact remains for trial. *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997). The party opposing summary judgment "must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). The non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue; he "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Finally, a scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

**FOURTEENTH AMENDMENT STANDARD**

As Plaintiff is an involuntarily committed civil acquitee, his claims are reviewed under the Fourteenth Amendment rather than the Eighth Amendment which applies to convicted prisoners. *See Rice v. Kim*, No. 20-3693, 2023 WL 8281571, at *3 (N.D. Ill. Nov. 30, 2023) (finding that in the case of a detainee, the Fourteenth Amendment's "objective reasonableness" standard applies, not the Eighth Amendment's "deliberate indifference" standard). *See Pittman by & through Hamilton v. Cnty. of Madison, Illinois*, 970 F.3d 823, 830 (7th Cir. 2020) (citing

*McCann v. Ogle Cnty.*, 909 F.3d 881, 886 (7th Cir. 2018) ("explaining that under *Miranda*,[3] 'a standard of objective reasonableness, and *not deliberate indifference*, governs claims under the Fourteenth Amendment's Due Process Clause.'") (emphasis in original). *See also Gunderson v. Corcoran*, No. 21-04891, 2023 WL 6049914, at *8 (N.D. Ill. Sept. 15, 2023) (finding that the "objective reasonableness" standard applied to the NGRI plaintiff) ("Such a finding in fact favors Gunderson, as the Fourteenth Amendment applies only a[n] 'objectively unreasonable' standard, whereas the Eighth Amendment applies [a] 'subjective unreasonableness' standard.") (citing *Miranda*, 900 F.3d at 350–52).

In considering whether a defendant's actions were reasonable, the first step is to determine whether the defendant "'acted purposefully, knowingly, or perhaps even recklessly when [he] considered the consequences of [his] handling of [plaintiff's] case.'" *McCann*, 909 F.3d at 886 (quoting *Miranda*, 900 F.3d at 353). The second step questions whether a defendant's conduct was objectively unreasonable. *Id.* This objective analysis is to be gauged, "without regard to any subjective belief held by the individual. . ." *Id.* "A detainee must prove more than negligence but less than subjective intent—something akin to reckless disregard." *Miranda*, 900 F.3d at 353. *See Rice*, 2023 WL 8281571, at *3 ("Inherent in the second question are the sub-questions whether the plaintiff 'suffered from an objectively serious medical condition' and 'whether the medical staff's response to it was objectively reasonable.'") (quoting *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019)).

**MATERIAL FACTS**

Under Illinois law, "[w]hen an individual has been acquitted of a crime by reason of insanity, [his] subsequent treatment is governed by section 5-2-4" of the Unified Code of

---

[3] *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018).

Corrections, 730 ILCS 5/5-2, *et seq. People v. Jurisec*, 766 N.E.2d 648, 653 (Ill. 2002). Section 5-2-4 authorizes the Illinois Department of Human Services (IDHS) to take custody of an individual (or insanity acquittee) in order to treat his or her mental illness while also protecting him or her and the community from his or her potential danger. *Id*. Under Section 5-2-4(b), every 90 days, the facility director is to file with the court a treatment plan report as to the acquitee's current status. This is so, as once an insanity acquittee has been committed to the custody of IDHS, "he may be detained only as long as he continues to be 'subject to involuntary admission' or 'in need of [inpatient] mental health services.'" *Jurisec*, 766 N.E.2d at 653 (quoting 730 ILCS 5/5-2-4(b)).

Plaintiff pled that in February 2018, McFarland psychiatrist, Dr. N. Vallabharen, diagnosed him with schizoaffective disorder in remission, and this diagnosis was "affirmed" by psychiatrist Dr. M. Reddy and social workers Tracey Mott, and Heather Parker. (Doc. 1 at 3). This diagnosis was re-confirmed by several psychiatrists and support staff throughout 2018. In March 2019, Defendant Dr. Horstman again found Plaintiff to be "in remission," with this diagnosis continuing until August 19, 2019, when Dr. Horstman issued an updated report finding Plaintiff in "partial remission." (Doc. 43-2 at 8-11). On September 17, 2019, Clinical Director Lynn forwarded the treatment team's *NGRI 90 Day Treatment Plan Report* ("*90 Day Report*") to the court. (Doc. 43-3). The Report documented Plaintiff's diagnosis as "Schizoaffective Disorder, bipolar type, in partial remission." *Id*. at 2. Plaintiff asserts that Defendants Horstman and Lynn are liable for "deliberate indifference" as to this allegedly faulty diagnosis.

Plaintiff claims that Defendants Horstman and Lynn's deliberate indifference in revising his diagnosis caused him injury; restrictions on computer use, inadequate nutrition, and restrictions on his movement within the facility. Defendant Horstman denies this, attesting that

the "'in partial remission' has no effect on his movement abilities or privilege status at McFarland facility." (Doc. 43-6 at 2). Defendant Horstman's claim is actually consistent with Plaintiff's deposition testimony where he admitted to being on Staff Supervision status, "the highest level of facility-provided privileges," even after the change in diagnosis. (Doc. 43-4 at 44-45). While Plaintiff testified vaguely as to unidentified privilege restrictions, these appear to have been in response to the Covid-19 pandemic, and the restrictions were admittedly not put in place "until quite a bit after the diagnosis change." (Doc. 43-4 at 43).

Defendant Horstman's affidavit also addresses the procedure to be followed in those cases where an acquitee's privilege levels are to be increased. She explained that the initial bodily movement or privilege level was determined by the acquitee's treatment team. (Doc. 43-6 at 2). Here, the treatment team was comprised of Dr. Horstman, Ms. Lynn, who was the Clinical Director at that time, a treating social worker, a nurse manager, and a member of the nursing staff. *Id*. If an increase was determined to be appropriate, the treatment team would send a request to the hospital administrator who would draft a letter to the court. The decision to increase privilege levels is ultimately made by the presiding judge. *Id*. at 3-4.

**ANALYSIS**

Deliberate Indifference[4]

As noted, to defeat summary judgment, the facts must support that Defendants acted purposefully, knowingly, or recklessly and that their treatment of Plaintiff was objectively unreasonable. *Andrews v. County of Sangamon*, No. 18-1100, 2021 WL 3733142, at *4 (C.D. Ill. July 1, 2021); *McCann*, 909 F.3d at 886.

---

[4] The Court uses the term "deliberate indifference" as that is how Plaintiff pled his claim but is mindful that the objectively unreasonableness standard, not the deliberate indifference standard applies in this case.

Plaintiff challenges the "in partial remission" diagnosis on two levels. In the first, he asserts that Defendant Lynn provided a report to Defendant Horstman which "was not based on the treatment of the Plaintiff, but rather the treatment of another recipient." (Doc. 1 at 4). He does not identify this report or particularly claim that Dr. Horstman relied on it. Additionally, the record supports that it was Defendant Horstman who authored the August 19, 2019, medical report which was implemented in the *90 Day Report* Defendant Lynn provided to the Court. *See* Lynn Declaration (Doc. 43-5). Plaintiff offers nothing to explain the alleged mistake in identity. Dr. Horstman's August 19, 2019 medical report clearly described Plaintiff, and documented that he was "groomed neatly in street clothing and his cowboy hat." (Doc. 43-2 at 8-11). Defendant Horstman further noted that his thought process was "goal-directed but illogical at times," *Id*. at 10, stating:

> "Overall, Mr. Dyjak's behavior and course over the past year reflect fairly good day to day function within the controlled and structured setting of the hospital, but continued poor insight to the illness which led to his crime, and refusal of both medication treatment to prevent relapse and meaningful reflection and acceptance of responsibility for his crime. Rather than working with hospital staff toward wellness, understanding of his illness and prevention of recurrence he has taken an adversarial stance."

*Id.* This substantiates that Defendant Horstman, the individual who authored the medical report, was obviously familiar with Plaintiff. Under these circumstances, no reasonable jury could believe that either Horstman or Lynn was referring to someone other than Plaintiff.

All issues of misidentification aside, Plaintiff claims that the revised diagnosis evidenced deliberate indifference. He insists that his proper diagnosis was "in remission" and that Defendants Horstman and Lynn "ignored" their prior findings when they revised the diagnosis. Defendant Horstman disputes this, attesting in her affidavit that she issued her diagnosis of "Schizoaffective Disorder, Bipolar type, in partial remission" after conducting a Comprehensive

8

Psychiatric Evaluation on August 15, 2019. (Doc. 43-6 at 1-2). The report was issued after "extensive research into Logan Dyjak's history and reflecting his current condition and DSM-5 text and criteria." *Id.* at 1. Defendant Lynn, too, has provided an uncontroverted affidavit. There, she asserts that she is not a physician and had "no involvement in making a psychiatric diagnosis." (Doc. 43-5 at 1). While she authors the reports to the Court, she does not author the medical reports, or make, or change, a patient's diagnosis. *Id*.

There is evidence that Dr. Horstman downgraded Plaintiff's evaluation to "in partial remission" based on his failure to cooperate with the treatment plan and failure to accept responsibility for his crime. Plaintiff does not establish that this was objectively unreasonable. His sole support for his position is that, in the past, he had been diagnosed as in full remission. The Court is aware, however, that mental health is not static and is subject to change for either the better or worse. Here, there are no facts to refute Defendant Horstman's "in partial remission" diagnosis or to support that it was objectively unreasonable.

Plaintiff's deliberate indifference claim also fails as to Defendant Lynn. Defendant Lynn has provided uncontroverted testimony that she is not a physician, did not participate in the August 19, 2019 diagnosis, and did not make any changes to Defendant Horstman's diagnosis when she submitted the *90 Day Report* to the court. As a result, she did not have the authority to engage in the complained-of conduct and did not personally participate in it. *See Sanville v. McCaughtry,* 266 F.3d 724, 740 (7th Cir. 2001) (stating that §1983 liability is predicated on fault, so to be liable, a defendant must be "personally responsible for the deprivation of a constitutional right.") (quoting *Chavez v. Ill. State Police,* 251 F.3d 612, 651 (7th Cir. 2001)); *see also Edmondson v. Decatur Co. Det. Ctr.*, No. 21-00499, 2021 WL 3129457, at *3 (S.D. Ind. July 23, 2021).

Even if there were a material question as to the alleged deliberate indifference, Plaintiff fails to establish that it caused him injury. Plaintiff's claimed injuries are restrictions on computer use, restrictions on his movement within the facility, and inadequate nutrition due to restricted access to the cafe. Defendant Horstman has provided uncontroverted testimony that the "in partial remission" diagnosis did not result in any restricted access and Plaintiff seemed to acquiesce to this at his deposition. As noted, Dr. Horstman's uncontested affidavit attests, and Plaintiff did not dispute, that he remained on Staff Supervisions status and did not suffer any movement restrictions as a result of the revised diagnosis. The *McFarland Mental Health Center Procedural Guide* provided by Defendants documents that Staff Supervision status "allows the patient to go to non-forensic, secure areas, i.e., the cafeteria and Psychosocial Rehabilitation Area." (Doc. 43-1 at 2).

Plaintiff's testimony as to his computer use is too vague to raise a material issue of fact as he testified that while he had access to a computer on his unit, he could not "use the computer across the street… to take college courses." *Id*. at 49. In fact, he did not particularly connect this to the diagnosis change, generally stating: "Well, once they were able to start alleging that I was suffering from a mental illness and experiencing symptoms, they can use that as a justification to restrict my liberties." *Id*. at 48. Plaintiff had, of course, been found to be mentally ill and symptomatic his entire time at McFarland. *See generally* (Doc. 43-2). Furthermore, outside of contract, there is no constitutionally protected right to a college education. *See Charleston v. Bd. of Trustees of Univ. of Illinois at Chicago*, 741 F.3d 769, 772 (7th Cir. 2013) (stating "our circuit has rejected the proposition that an individual has a stand-alone property interest in an education at a state university.") (internal citations omitted). *See also Zimmerman v. Tribble*, 226 F.3d 568, 571 (7th Cir. 2000) ("'[i[n *Higgason v. Farley*, 83 F.3d 807, 809 (7th Cir.1996), we held that the

10

denial of access to educational programs does not infringe on a protected liberty interest'"); *accord Meisberger v. Cotton*, 181 Fed. Appx. 599, 601 (7th Cir. 2006).

Plaintiff's bald claim to poor nutrition is insufficient to establish a material issue of fact as to this issue. While he claims restricted access to the café, he does not claim that he did not otherwise have access to meals or that the meals he was provided were so lacking in nutrition he needed to supplement them. In addition, the *McFarland Mental Health Center Procedural Guide* provides that an individual in Staff Supervision status has the "liberty" to eat in the cafeteria. The Guideline also appears to use the terms "cafeteria" and "café" interchangeably. *See* (Doc. 43-1 at 2-3) stating, "Please note that any change in privilege level that affords a patient the liberty of dining in the cafeteria will take effect on the following day, to allow for processing of diet-related implications (See NUR117, and Attachment - Coming to Café)."

Here, a review of the record does not support that Defendant Horstman's revised diagnosis was objectively unreasonable, that it was based on information concerning another patient, or that Defendant Lynn made or revised the diagnosis. As a result, there is nothing to support that either Defendant acted with objective unreasonableness in relation to Plaintiff's diagnosis.

Plaintiff has also alleged that Defendant Miller and, perhaps, Lynn, are liable for failing to act on his grievance of the "deliberate indifference." As previously noted, a defendant cannot be liable for a constitutional deprivation, however, unless she personally participated or had direct responsibility for the deprivation. Here, Plaintiff did not plead that Miller exhibited deliberate indifference in his treatment or had anything to do with his revised diagnosis. As a result, she did not personally participate in the alleged deprivation and cannot be held liable for it. *See Sanville* 266 F.3d at 740; *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (citing

11

*Wilson v. Warren Cty.*, 830 F.3d 464, 469 (7th Cir. 2016)). In addition, neither Defendant can be held liable merely for not attending to Plaintiff's grievance. *See Owens v. Hinsley,* 635 F.3d 950, 953 (7th Cir. 2011) ("[T]he alleged mishandling of [Plaintiff's] grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim."); *Larue v. Estate of Obaisi*, No. 18-932, 2021 WL 3290919, at *9 (N.D. Ill. Aug 2, 2021) ("Involvement in the grievance process, standing alone, is insufficient to give rise to personal liability.").

<u>Due Process</u>

In Count II of the complaint, Plaintiff pled a due process claim against Defendant Lynn, whom he identified as the individual "responsible for adopting policies and training personnel to preserve Plaintiff's due process rights." (Doc. 1 at 7). In the prayer for relief, however, he named a different Defendant. There, Plaintiff indicated that he sought only injunctive relief, "ordering Defendant Miller to adopt policies and trained personnel to ensure treatment plans to allow consideration for the exercise of professional judgment in restricting bodily movement." (Doc. 1 at 10). Plaintiff's complaint was not initially interpreted as pleading against Defendant Miller, (Doc. 7), but on Plaintiff's motion to reconsider, the Court affirmed that, in addition to Defendant Lynn, Plaintiff had stated "a claim against Defendant Miller based on an alleged blanket policy restricting movement in and out of the facility that is not based on the exercise of professional judgment." *See* May 24, 2022 text order.

In support of these claims, Plaintiff explains that at a prior point, § 5/5-2-4 allowed acquitees in DHS custody to be placed in a non-secure setting if ordered by the court. Plaintiff had a treatment plan in place with the court when the statute was amended. The amendment,[5] however, struck all reference to placement in a non-secure setting, so the court no longer had the

---

[5] *Proceedings after Acquittal by Reason of Insanity*, 730 ILCS 5/5-2-4 (2019) (amended 2021).

discretion to order it. Plaintiff claims that after the amendment, McFarland staff would write treatment plans which allowed non-secure access based on the treatment team's "professional judgment," rather than the previously required court order. *Id.* at 6. While it is not clear, Plaintiff appears to assert a two-fold argument. The first is a lost opportunity, that Defendants never petitioned the Court to place him in a non-secure setting when it was still possible to do so. The second is that, after the amendment, staff allowed some acquitees access to non-secure settings, but not Plaintiff. Plaintiff specifically alleges that due to an otherwise unidentified "blanket policy," Defendant Lynn failed to make an "individualized determination[]" as to his eligibility for non-secure setting privileges. (Doc. 1 at 9).

The Fourteenth Amendment prohibits a state actor depriving "'any person of life, liberty, or property, without due process of law.'" *Roach v. Indiana Dept of Correction*, No. 21- 371, 2022 WL 1184559, at *2 (N.D. Ind. Apr. 20, 2022) (quoting U.S. Const. amend. XIV, § 1). For Fourteenth Amendment liability to attach, the Plaintiff must have had a protected liberty or property interest at stake. *Id.* (citing *DeWalt v. Carter*, 224 F.3d 607, 613 (7th Cir. 2000), *abrogated on other grounds by Savory v. Cannon*, 947 F.3d 409 (2020). Here, Plaintiff claims a liberty interest in being allowed access to non-secure settings. Although asserting this lack of access, Plaintiff testified that, at times, staff allowed him supervised and unsupervised off-ground privileges. (Doc. 43-4 at 45.) He asserts, however, that while he enjoyed these privileges, he did not have the "legal right to be using them," and that "they" violated his due process rights "by not securing those privileges for me…". *Id.* In other words, that Defendants Lynn and Miller did not request a court order when such relief was available, and did not grant non-secure setting privileges based on the team's professional judgment, when court-ordered relief was no longer available.

In the case of a convicted prisoner, "Due process is only required when punishment extends the duration of confinement or imposes 'an atypical and significant hardship on him in relation to the ordinary incidents of prison life.'" *Roach*, 2022 WL 1184559, at *2 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). This "atypical and significant hardship" standard is also applied to those civilly committed. *See Thielman v. Leean*, 282 F.3d 478, 483–85 (7th Cir. 2002) (finding as to a civilly committed sexually dangerous detainee, that *Sandin* "applies with equal force to persons confined under Chapter 980."[6]). *See id*. (explaining that, while the plaintiff was not a prisoner, "his confinement has deprived him (legally) of a substantial measure of his physical liberty.")

The *Thielman* court found that plaintiff was required to "identify a right to be free from restraint that imposes atypical and significant hardship in relation to the ordinary incidents of his confinement." *Id*. at 484. There, the Plaintiff asserted that a prior statute that allowed the use of handcuffs during transport, and which was amended to allow the additional use of a waistbelt and leg irons, violated due process. The Court disagreed, finding that the enhanced security measures did not amount to an "'atypical'" and "'significant'" hardship. Instead, there were merely an "'incremental' deprivation'" which did not implicate "a state-created liberty interest in the wake of *Sandin*." *Id*.

Here, Plaintiff testified that on occasion, he had access to non-secure settings, but this was not officially sanctioned in a court order or treatment plan. Plaintiff appears to believe that his commitment should not have imposed any restrictions on his liberty. Referring to himself while testifying at his deposition, he stated, "they do not have the ability to restrict an individual's liberties when they are not suffering from a mental illness." (Doc. 43-4 at 32-33).

---

[6] The Wisconsin *Sexually Violent Person Commitments Act*, Wis. Stat. Ann. § 980.01.

14

He also testified that due to his placement on the Monroe minimally secure unit, he was "supposed to be provided with basically every liberty." *Id.* at 38-39. Contrary to Plaintiff's beliefs, Defendants had the authority exercise some control over his liberties without running afoul of due process. Plaintiff has pled nothing to support that his intermittent lack of access to non-secure settings resulted in an atypical and significant hardship in relation to the "ordinary incidents' of his civil confinement." *Thieman*, 282 F.3d at 484.

Qualified Immunity

As the Court has found that Defendants conduct did not violate Plaintiff's Fourteenth Amendment rights, it need not address whether Defendants are entitled to qualified immunity. *See Rogers v. Love*, No. 21-4048, 2024 WL 268385, at *6 (C.D. Ill. Jan. 24, 2024) (citing *Johns v. Tinsley*, No. 16-1106, 2018 WL 10811472, at *5 (C.D. Ill. Mar. 7, 2018) (in turn citing *Van den Bosch v. Raemisch*, 658 F.3d 778, 787 n. 9 (7th Cir. 2011)).

## CONCLUSION

For the reasons stated above, the Court hereby GRANTS Defendants' Motion for Summary Judgment (Doc. 42). The Clerk is directed to enter judgment and close this case.

ENTERED: This 15th day of February 2024.

                                ___s/James E. Shadid___
                                JAMES E. SHADID
                        UNITED STATES DISTRICT JUDGE